UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


RANDI NICOLE JOHNSON,            )
                                 )
          Plaintiff,             )
                                 )    Case No. 4:07CV01584 FRB
                                 )
          v.                     )
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
          Defendant.             )


**MEMORANDUM AND ORDER**


          This matter is on appeal for review of an adverse ruling by the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

          On October 21, 2005, plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability as of February 1, 2001 due to fibromyalgia, depression, anxiety, headaches, temporomandibular joint syndrome, irritable bowel syndrome, genital herpes and genital warts.  (Tr. 56-61; 89.)  Plaintiff's applications were denied, and she filed a request for a hearing before an administrative law judge ("ALJ").  (Tr. 23-29; 37.)  On March 20,

2007, a hearing was held before ALJ Randolph E. Schum.  (Tr. 12;
355-80.)  On April 26, 2007, ALJ Schum issued his decision denying
plaintiff's applications.  (Tr. 12-22.)

Plaintiff filed a request for review of the ALJ's hearing
decision with defendant agency's Appeals Council, submitting
pharmacy records dated from 2001 to January 2007, and a brief from
plaintiff's representative.  (Tr. 7-8.)  On August 10, 2007, the
Appeals Council denied plaintiff's request for review, stating that
it had reviewed the additional evidence submitted. (Tr. 4-7.)  The
ALJ's decision thus stands as the final decision of the
Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### I.  Plaintiff's Testimony

During the administrative hearing, plaintiff was
represented by attorney Traci L. Severs.  Plaintiff testified that
she was twenty-seven years of age, and had a GED and a medical
assistant's certificate.  (Tr. 357-58.)  She has a twelve-year old
daughter.  (Tr. 361.)

Plaintiff testified that she last worked as a medical
assistant at SLU Care in 1999, and held this job for a little more
than a year.  (Tr. 358.)  Plaintiff worked as a clerk in a gas
station in 1998, and worked in shipping and receiving in 1996 and
1997.  Id.  Also in 1996, plaintiff worked for two months as a
phone programmer.  Id.  In 1995, plaintiff worked for ten months at

a White Castle restaurant. (Tr. 358-59.) Plaintiff testified that, while she was considered to be part-time at White Castle, she averaged 38 hours per week. (Tr. 359.) Plaintiff testified that she lost her medical assistant's job when the office closed, stating that all employees in the office also lost their jobs. (Tr. 360-61.)

Plaintiff testified that she saw a psychiatrist named Dr. Stromsdorfer in 2000 and 2002, but stopped seeing him when he discharged her from his care for being rude to the front office staff, stemming from plaintiff's request for a letter from Dr. Stromsdorfer. (Tr. 361-62.) Plaintiff testified that she is currently seeing Nigel Darvell, a therapist, for complaints related to fibromyalgia, anxiety and depression. (Tr. 362.) Plaintiff testified that Mr. Darvell helps her deal with the day-to-day pain of fibromyalgia, and helps her with activities to try to lessen her pain. Id.

Plaintiff testified that she was first diagnosed with fibromyalgia by Dr. Steven Sanders, and later by Dr. Pierre Moser, a rheumatologist. (Tr. 362-63.) Regarding Dr. Moser, plaintiff testified that he diagnosed her fibromyalgia after ruling out other disorders, and decided there was nothing he could do for her, and referred her to other rheumatologists at Barnes Jewish Hospital, and was ultimately told that the only treatment available was pain management through medication. (Tr. 363.) Plaintiff testified that she currently has chronic pain throughout her body, and

swelling in her hands and knees. (Tr. 364.) She testified that she has trouble sitting or standing for long periods, and has chronic neck and back pain. Id. She testified that, if she sits in one position for too long, her knees will get "cramped into that position", and her hips "will be, you know, to the point - - sometimes it [sic] hard for me to walk." Id. Plaintiff testified that she got "stuck" while sitting due to pain in her back and cramping in her knees and hips, and testified that she had to change positions often while sitting. (Tr. 366.) Plaintiff testified that her difficulties with walking had improved with medication. (Tr. 364.)

The ALJ noted that Dr. Helton had diagnosed plaintiff with chronic fatigue syndrome in February of 2006, and plaintiff testified that she underwent sleep studies which were all negative. (Tr. 364-65.) The ALJ further noted that Dr. Helton indicated that plaintiff had been doing better on her medications from August of 2006 through January of the present year, and plaintiff testified that she sometimes did better, but at other times she did worse. (Tr. 365.)

Plaintiff testified that she was able to lift a gallon of milk and do dishes, and that she bagged her own groceries and carried them. (Tr. 365-66.)

Regarding her claim for disability due to anxiety and depression, plaintiff testified that she related her psychological issues to her fibromyalgia, and that she had a strong family

4

history of depression and mental illness. (Tr. 366-67.)

Plaintiff testified that, in 2006, she contacted the Department of Vocational Rehabilitation to see if there was work available for which she could be trained. (Tr. 367.) Plaintiff testified that they would not work with her because Dr. Helton had written a letter stating that she was "unable to do the work." Id.

Plaintiff then responded to questions from her attorney. Plaintiff testified that she had not seen Mr. Darvell in the past four weeks because she had been in a car accident, and had no transportation. (Tr. 368.) Plaintiff testified that, before the accident, she had seen him once per week, but could not recall how long she had been seeing him that frequently. (Tr. 369.) Plaintiff testified that her psychological condition had worsened, and that she felt that her mental problems were causing her fibromyalgia to worsen. Id. Plaintiff's attorney noted that plaintiff was crying, and plaintiff testified that she was crying because she was nervous and was having trouble remembering dates and other details because of the fibromyalgia. (Tr. 369-70.)

Plaintiff testified that, when she sees Mr. Darvell, she talks to him about what she wants out of life, and how she is disappointed with her life. Id. She testified that she had enjoyed working and wanted to return to work one day, and wanted to return to college. Id. Plaintiff testified that she had tried to return to college twice since being diagnosed with fibromyalgia and depression, but that there was too much stress and her depression

and fibromyalgia worsened.  (Tr. 370-71.)

Plaintiff testified that she had crying spells at least once a week in Mr. Darvell's office, and at home when she felt stressed out and guilty about her daughter.  (Tr. 371.)  Plaintiff testified that she saw a psychiatrist named Claudia Diamontes every three to four months, at which times she was prescribed medication. Id.  Plaintiff testified that she once weighed over 200 pounds but currently weighed 155 pounds, and had recently quit smoking.  (Tr. 371-72.)  She testified that, before she wrecked her car, she went swimming at the YMCA two to three days per week, and that this activity had been recommended by Dr. Helton.  Id.

Plaintiff testified that she took several medicines every day, and used a daily medication reminder to manage them.  (Tr. 373.)  She testified that she took Oxycodone[1] three times per day, and had no side effects.  Id.  Plaintiff testified that she saw Dr. Helton every 30 days for refills of Oxycodone.  Id.

Plaintiff testified that Topamax[2] and Diazepam[3] made her feel tired and she therefore took them at bedtime, but still had

---

[1]Oxycodone is an opiate analgesic used to relieve moderate to severe pain.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html

[2]Topamax, or Topiramate, is used alone or with other medications to treat certain types of seizures in people who have epilepsy. Topiramate is also used to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html

[3]Diazepam, also called Valium, is used to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682047.html

trouble sleeping. (Tr. 373-74.) She testified that she woke frequently during the night, and had trouble falling asleep. (Tr. 374.) Plaintiff testified that she took a three to five-hour nap almost daily, and that she slept better during the day than at night. Id. Plaintiff testified that she sometimes fell asleep on the couch, and sometimes returned to her bed. (Tr. 374-75.) Plaintiff testified that she felt she would cry and have problems if she worked because, if she was yelled at or "talked down on" or told something negative, she broke down and cried. (Tr. 375-76.)

The ALJ then heard testimony from Jeff McGroskey, Ph.D., a vocational expert ("VE"). The ALJ specified that, for the first two hypothetical questions, Dr. McGroskey was to assume a hypothetical claimant who could understand, remember, and carry out at least simple instructions and non-detailed tasks; could respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; could adapt to routine, simple work changes; and could take appropriate precautions to avoid hazards. (Tr. 377.) For the first hypothetical, the ALJ specified a claimant aged 21 at the date of onset with a GED, who could lift and carry up to 20 pounds occasionally and 10 pounds frequently; who needed a sit/stand option; had the same past work experience as plaintiff; and was occasionally able to climb stairs and ramps, but never ropes, ladders or scaffolds. (Tr. 377-78.) Dr. McGroskey testified that such a claimant would be unable to return to any past relevant

7

work, but could perform some light work, including office helper and small parts assembler. (Tr. 378.) Dr. McGroskey offered testimony indicating that both of these jobs existed in significant numbers in the local and national economies, and testified that the numbers for these jobs had been adjusted to accommodate the sit/stand option. (Tr. 379.)

The ALJ indicated that his second hypothetical was based upon the residual functional capacity ("RFC") assessment of Dr. Helton. (Tr. 378.) The ALJ asked Dr. McGroskey to assume the same psychological restrictions, but to otherwise assume a claimant who could lift zero pounds; could sit for two hours out of eight; could stand or walk four hours out of eight; and could occasionally climb stairs and ramps, but could rarely climb ropes, ladders, and scaffolds, and could rarely stoop and crouch. (Tr. 378-79.) Dr. McGroskey testified that such a person could not perform any work in the national or state economy. (Tr. 379.)

The ALJ indicated that his third hypothetical was based upon the RFC by Nigel Darvell, which Dr. McGroskey testified that he had reviewed. (Tr. 379.) The ALJ asked Dr. McGroskey to base his opinion on that RFC of psychological limitations only. Id. Dr. McGroskey testified that such an individual would be unable to perform any work in the state or national economy. Id.

II. Medical Records

Records from the office of Stephen G. Sanders, M.D., of Mercy Internal Medicine, indicate that plaintiff was seen on July

8

19, 2000 and reported that her medications were not helping her, and that she had difficulty sleeping at night. (Tr. 118.) She reported sleeping eight to ten hours during the day, and was unable to motivate herself to do anything during the day. Id. She reported feeling persistent back pain that was sometimes severe. Id. She reported that she had dropped out of school and was not working, and that she cried all of the time and had difficult relationships with family and friends. Id. She declined suicidal ideation, and denied the desire to go to the hospital for treatment, and had no confidence that she would get better. (Tr. 118.) Physical exam was normal, and Dr. Sanders' impression was depression and low back pain secondary to weight gain and lack of exercise. Id. He instructed plaintiff to walk every day and do low-back stretching exercises, and to continue counseling. Id. Dr. Sanders also wrote "consider hospitalization." Id.

Plaintiff returned on August 9, 2000 and reported that "things have improved significantly." (Tr. 121.) She was taking Prozac,[4] BuSpar,[5] and Ativan.[6] Id. She reported that she was ready to start school despite feeling frustrated and depressed. Id. She

---

[4]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[5]BuSpar, or Buspirone, is used to treat anxiety disorders, or in the short-term treatment of symptoms of anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html

[6]Ativan, or Lorazepam, is used to treat anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html

also reported experiencing migraine headaches. <u>Id.</u> Dr. Sanders advised plaintiff to follow up in three months. (Tr. 121.) Plaintiff returned on November 29, 2000 with complaints of a "strange" feeling in the right side of her body starting at the knee; tightness and cramping in her right hand; a headache, and neck pain. (Tr. 120.) Physical exam was negative, and it was opined that plaintiff's neck pain was likely soft tissue in nature, and it appears that plaintiff was given Naprosyn[7] for her knee pain. <u>Id.</u>

Records from Jefferson Memorial Hospital indicate that plaintiff presented on December 26, 2000 with complaints of right knee pain with no trauma. (Tr. 197.) Radiological studies revealed a small effusion, but were otherwise normal. (Tr. 200.)

Plaintiff returned to Dr. Sanders on January 31, 2001. (Tr. 117.) Dr. Sanders noted that plaintiff had been evaluated by Dr. Pierre Moser, a rheumatologist, and that all evaluations had been negative. <u>Id.</u> Plaintiff complained of persistent debilitating pain which caused her to require two to six Vicodin[8] per day. <u>Id.</u> Dr. Sanders recommended physical therapy and regular

---

[7]Naprosyn is used to relieve pain, tenderness, swelling and stiffness associated with different types of arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[8]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

exercise and prescribed Vioxx,[9] and recommended that plaintiff take Vicodin on a decreasing schedule. _Id._ He indicated that her depression was fairly controlled at best. (Tr. 117.)

Plaintiff returned to Jefferson Memorial Hospital on April 23, 2001 with complaints of back spasms, and right rib pain. (Tr. 194.) It is noted that she refused the treatment offered, and requested narcotics. (Tr. 196.) The physician advised her that no narcotics could be given unless she had someone to come and pick her up, and plaintiff left the hospital against medical advice. _Id._

Plaintiff returned to Jefferson Memorial Hospital on July 23, 2001 with complaints of pain she attributed to fibromyalgia. (Tr. 184-85.) She denied suicidal or homicidal intent. (Tr. 185.) She reported that she wanted to take care of her daughter, and promised to follow up with her private care physician, psychiatrist and counselor. _Id._ Plaintiff returned on August 6, 2001 and underwent lab testing for chlamydia and gonorrhea, and was prescribed Rocephin and Zithromax.[10] (Tr. 176, 178.)

Records from Community Treatment, Inc. ("COMTREA")

_____

[9]Vioxx, or Rofecoxib, is a nonsteroidal anti-inflammatory drug NSAID) developed by Merck & Co. to treat osteoarthritis, acute pain conditions, and dysmenorrhoea. http://en.wikipedia.org/wiki/Vioxx. On September 30, 2004, its manufacturer voluntarily withdrew it from the market due to concerns about increased cardiac risks associated with long term, high-dosage use. _Id._

[10]Zithromax, or Azithromycin, is used to treat certain infections caused by bacteria, such as bronchitis; pneumonia; sexually transmitted diseases; and infections of the ears, lungs, skin, and throat. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697037.html

indicate that plaintiff was seen on August 10, 2001 by Jose da Silva, M.D., a psychiatrist. (Tr. 140-42.) It is noted that plaintiff had a "long history of poor adaptation to life." (Tr. 140.) Plaintiff reported that she had become pregnant at the age of 15 and dropped out of school in the tenth grade, and later obtained her GED. <u>Id.</u> It is noted she worked sporadically in menial jobs; did nothing for two and one-half years; currently lived alone with her daughter; and received public support. <u>Id.</u> Plaintiff reported beginning treatment three years ago and underwent psychotherapy for six months, but quit because the therapist did not want to see her any longer after she missed two appointments. <u>Id.</u> It is noted that she had been given "all sorts of meds" which seemed to work initially, but such results did not last long. (Tr. 140.)

Plaintiff reported a history of fibromyalgia, but did not know the results of lab work recently obtained at Jefferson Memorial Hospital. (Tr. 141.) Dr. da Silva noted a history of "extensive promiscuity, including prostitution devoid of protection and discrimination." <u>Id.</u> Dr. da Silva noted that plaintiff was raising her child alone and that her parents lived out of town, had no hobbies or interests, and had only vague thoughts regarding her future. <u>Id.</u>

Upon exam, Dr. da Silva noted that plaintiff was well dressed and groomed, but was "sad and tearful." <u>Id.</u> She showed no signs of physical distress. (Tr. 141.) Her sensorium and

12

cognitive functions were intact; her intelligence was within normal limits; she was polite and sociable; and she showed no signs of disordered thought processes, hallucinations, or delusions.  <u>Id.</u> She was, however, noted to be extremely depressed and seemingly hopeless, and demonstrated very poor self esteem.  <u>Id.</u>  Dr. da Silva diagnosed recurrent major depression, and personality disorder not otherwise specified, with dependent and borderline features.  (Tr. 142.)  He recommended that plaintiff continue in intensive psychotherapy, and be referred to vocational rehabilitation.  <u>Id.</u>

Plaintiff returned to COMTREA on August 24, 2001, stating that she had felt uncomfortable with Dr. da Silva, and was then evaluated by Steve Stromsdorfer, M.D., a psychiatrist.  (Tr. 143-45.)  Plaintiff reported that she had experienced depression and anxiety since the age of 12 or 13, and cried daily.  (Tr. 143.) She reported sleeping poorly and having no energy.  <u>Id.</u>  Plaintiff reported taking Anaprox,[11] Vicodin, Zithromax, and Rocephin.[12]  <u>Id.</u>

Upon exam, Dr. Stromsdorfer found plaintiff to be

---

[11]Anaprox, or prescription Naproxen, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[12]Rocephin, or Ceftriaxone, is used to treat bacterial infections, including sexually transmitted diseases, pelvic inflammatory disease, meningitis, and infections of the lungs, ears, skin, urinary tract, blood, bones, joints, and abdomen.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685032.html

casually dressed and groomed, and frequently tearful. (Tr. 144.)
She was alert, with fair concentration and memory, with at least
average intelligence. Id. Dr. Stromsdorfer diagnosed plaintiff
with moderately severe recurrent major depressive disorder,
dysthymia,[13] and anxiety disorder. It was recommended that
plaintiff take Serzone,[14] and to use Vicodin and other pain
relieving drugs sparingly. (Tr. 145.) Dr. Stromsdorfer assessed
plaintiff's GAF[15] at 60. Id.

Plaintiff returned to Dr. Stromsdorfer on September 14,
2001, stating that her mood had not improved, and she still had low
energy levels and insomnia. (Tr. 146.) Dr. Stromsdorfer noted
that plaintiff was casually dressed and groomed, and was very
dysphoric and tearful. Id. He opined that her depression and
anxiety remained unchanged, and advised her to increase her Serzone
dosage, and to follow up in three weeks, but that "it is suspected
that we will be meeting sooner." Id. He assessed plaintiff's
current GAF at 60. Id.

Records from the office of Jeffrey Mormol, M.D., an
obstetrician/gynecologist, indicate that plaintiff was seen on
September 19, 2001 with complaints of pelvic pain. (Tr. 225.)

---

[13]Dysthymia is a chronic form of depression characterized by moods that
are consistently low, but not as extreme as in other types of depression.
http://www.nlm.nih.gov/medlineplus/ency/article/000918.htm

[14]Serzone, or Nefazodone, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695005.html

[15]GAF stands for "Global Assessment of Functioning".

14

Exam was normal, and it was opined that there may be a gastrointestinal component to her complaints. Id. She returned on April 13, 2002 with the same complaints, and it was opined she had non-specific vaginitis. (Tr. 224.) She returned on August 15, 2002 with complaints of pain, and was diagnosed with vulvar lesions, but a herpes culture was negative. (Tr. 223, 220.) She returned on October 10, 2002 with no complaints and had a normal exam. (Tr. 222.)

Dr. Stromsdorfer's records indicate that plaintiff failed to appear for an October 5, 2001 appointment. (Tr. 146-47). An October 22, 2001 office note indicates that medications were adjusted, and a note dated October 25, 2001 indicates that plaintiff did not appear for an appointment scheduled for that day. (Tr. 147.) Dr. Stromsdorfer's records further indicate that plaintiff called the office on October 9, 2001 and October 22, 2001 with complaints of stress and anxiousness. (Tr. 147, 150.)

Plaintiff saw Dr. Stromsdorfer on October 30, 2001, and reported being overwhelmed at work, and that the doctor she worked for was very critical, and that he tolerated no mistakes and would not let her sit down. (Tr. 137.) She reported suffering anxiety and depression after losing a job she loved. (Tr. 138.) The results of a mental status screening revealed that plaintiff's general appearance, thought content and processes, orientation, and judgment, memory, self-concept and insight were within normal limits, but that she had abnormal activity levels and an abnormal

15

mood.  (Tr. 137.)

Plaintiff saw Dr. Stromsdorfer on November 8, 2001 and stated that she was not doing well, and that she had quit her job. (Tr. 149.)  Dr. Stromsdorfer noted her to be more dysphoric, and discontinued Serzone in favor of Xanax[16] and Nortriptyline.[17]  Id. Dr. Stromsdorfer wrote as follows: "[m]edical results were given to DFS[18] recommending full leave of absence from any type of work at this time with tentative extension through January 1, 2002."  Id. (footnote added.)  He assessed plaintiff's current GAF at 55.  Id. Plaintiff returned to Dr. Stromsdorfer on December 3, 2001 and reported an improved mood, far fewer crying spells, and decreased hopelessness.  (Tr. 148.)  Her sleep was still somewhat disrupted. Id.  Dr. Stromsdorfer noted that her somatic focus on pain was improving along with her mood, and assessed her current GAF at 60. Id.  She was advised to follow up in three weeks.  Id.

Plaintiff presented to Jefferson Memorial Hospital on January 18, 2002 with complaints of a sore throat.  (Tr. 172.)  She was prescribed Lorcet, and told to use chloraseptic.  Id.  No other complaints were noted.  See (Tr. 172-75.)  She returned to the hospital on February 14, 2002 with complaints of severe left ankle

---

[16]Xanax, or Alprazolam, is used to treat anxiety disorders and panic attacks.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html

[17]Nortriptyline is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html

[18]DFS stands for "Division of Family Services."

pain resulting from an accidental fall. (Tr. 167-68.) Radiological study revealed a fracture and soft tissue swelling. (Tr. 170.) She was given crutches. (Tr. 169.) The Emergency Physician Record indicates the results of a psychiatric exam, that plaintiff's mood and affect were normal. (Tr. 168.)

Plaintiff returned to Dr. Stromsdorfer on February 21, 2002 and reported feeling worse, stating that she still felt unable to function in a work setting. (Tr. 154.) Dr. Stromsdorfer assessed plaintiff's current GAF at 60, prescribed Effexor XR,[19] and advised her to follow up in two weeks. Id. Plaintiff did not appear for her scheduled appointment on February 28, 2002. (Tr. 153.)

Plaintiff was seen again on March 7, 2002, and Dr. Stromsdorfer noted that plaintiff exhibited an improved mood and was slightly better. (Tr. 152.) He increased her dosage of Effexor. Id. He assessed a current GAF of 60, and advised her to follow up in one month. Id.

An office note indicates that, on March 19, 2002, her appointment was rescheduled to April 15, 2002. (Tr. 153.) On April 15, 2002, she reported doing better, and reported no side effects other than dry mouth. (Tr. 151.) Dr. Stromsdorfer noted that her diagnoses remained unchanged, but that she was doing

---

[19]Effexor, or Venlafaxine, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

somewhat better. Id. He advised plaintiff to follow up in two months. Id.

A COMTREA office note indicates that, on July 8, 2002, plaintiff telephoned the office at 3:20 p.m. to cancel her 3:15 p.m. appointment, stating that her car would not start. (Tr. 155.) Dr. Stromsdorfer then noted as follows: "[s]everal staff at the front desk indicated that she has been verbally belligerent on the phone with them." Id. Dr. Stromsdorfer went on to note that he spoke to plaintiff on the phone and told her of such reports, and advised her that, if there were any further incidents of such nature, he would terminate her care and refer her out of the COMTREA system. Id. Dr. Stromsdorfer continued her Effexor and Xanax. Id.

On August 1, 2002, plaintiff saw Dr. Stromsdorfer and reported high stress and pain. (Tr. 156.) She reported taking her medications as directed with no side effects. Id. Dr. Stromsdorfer noted that plaintiff's diagnoses remained unchanged, and assessed plaintiff's current GAF at 60. Id. Dr. Stromsdorfer increased her dosage of Effexor. Id. It is noted that Dr. Stromsdorfer and plaintiff discussed the fact that her anxiety and lability could cause her to act as she did with the staff, and opined that plaintiff currently met criteria for disability based upon psychiatric illness. Id.

Plaintiff was seen again on August 19, 2002, and reported that her mood was about the same, but she was suffering from

18

decreased libido. (Tr. 158.) It is noted that major stress had occurred with a female friend in terms of "turbulence with the friend's husband", but that plaintiff was disassociating herself from this situation. Id. Dr. Stromsdorfer noted that plaintiff was doing better "despite her subjective reports", and that she did not disagree when advised of this. Id.

On September 9, 2002, plaintiff arrived 15 minutes late for her scheduled appointment with Dr. Stromsdorfer, and was irate and loud in the waiting room when she was informed that there was no report available. Id. Plaintiff was advised that she would need to find a new doctor. (Tr. 158.)

On September 25, 2002, plaintiff presented to Jefferson Memorial Hospital with complaints of pain in her left great toe, stating that she had accidentally kicked a sandbox. (Tr. 163-64.) Under "past history", it is indicated that plaintiff had fibromyalgia, depression, and anxiety, although complaints related to these conditions are not noted. (Tr. 164.) Plaintiff was diagnosed with a fracture of her left great toe and given Toradol[20] and Vicodin, and advised to follow up with an orthopedist in one week. (Tr. 163.) Plaintiff returned to the hospital on October 3, 2002, reporting that none of the orthopedists would accept her insurance. (Tr. 160, 162.) She was given Vicodin and instructed

---

[20]Toradol, or Ketorolac, is used on a temporary basis to relieve moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693001.html

to follow up with her private care physician.  (Tr. 160.)

The administrative transcript includes records from Nigel Darvell, ACSW, LCSW, a social worker.  (Tr. 240-65.)  Although a large portion of Mr. Darvell's notes are illegible, portions are discernible, and those portions will be included in this summary. See Id.  Mr. Darvell's records indicate that plaintiff was first seen on April 30, 2003, and Mr. Darvell planned to obtain fibromyalgia support group information for plaintiff.  (Tr. 241.)

Records from Byrnes Mill Medical Center, the office of Dwayne Helton, D.O., indicate that plaintiff was seen on May 16, 2003 with complaints of a sore throat.  (Tr. 206.)  She reported some body aches and fatigue, but reported that these symptoms were normal for her.  Id.  She complained of fatigue and malaise, but denied fever or any other symptoms.  Id.  Physical exam was unremarkable, and she was noted to have normal bowel sounds.  Id. Dr. Helton diagnosed allergic rhinosinusitis, fibromyalgia, depression, obsessive compulsive disorder, and irritable bowel disorder, although no objective testing results are indicated. (Tr. 206.)  Dr. Helton also indicated that plaintiff had a sleep study pending for August, as ordered by her rheumatologist.  Id.

On July 14, 2003, plaintiff returned to Dr. Mormol's office and saw Donna L. Wenzelburger, a nurse practitioner, with complaints of a painful lesion.  (Tr. 221.)  She was diagnosed with herpes simplex virus 2, and right inguinal lymphadenopathy, and

given Acyclovir.[21]  Id.  She returned on July 21, 2003 with no complaints.  (Tr. 220.)

On June 11, 2003, plaintiff saw Mr. Darvell and reported that her mood was better since medication was added.  (Tr. 242.) When plaintiff returned on July 28, 2003, Mr. Darvell noted that, overall, plaintiff's mood management was good.  (Tr. 243.)  On August 25, 2003, it is noted that plaintiff had "school today." (Tr. 245.)  She had some anxiety, and it appears that stressors and her ability to manage school pressure was discussed.  Id.  On September 15, 2003, she reported some increase in symptoms of depression.  (Tr. 246.)

Plaintiff returned to Dr. Mormol on October 16, 2003 for a comprehensive exam with complaints unrelated to her present applications.  (Tr. 219.)  She returned on October 21, 2003 for evaluation and treatment for a herpes outbreak, and was again given Acyclovir.  (Tr. 218.)  She returned on May 1, 2004 with complaints of pelvic pain, and Dr. Mormol noted that the etiology was unclear, but may be a complication of fibromyalgia.  (Tr. 217.)  On November 10, 2004, she was seen by Dr. Mormol for a comprehensive exam, and reported no complaints.  (Tr. 216.)

---

[21]Acyclovir is used to decrease pain and speed the healing of sores or blisters in people who have varicella (chickenpox), herpes zoster (shingles; a rash that can occur in people who have had chickenpox in the past), and first-time or repeat outbreaks of genital herpes (a herpes virus infection that causes sores to form around the genitals and rectum from time to time). Acyclovir is also sometimes used to prevent outbreaks of genital herpes in people who are infected with the virus.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681045.html

On November 20, 2003, plaintiff saw Mr. Darvell and reported that she wanted to quit school, but on December 8, 2003, it is noted that she was still in school, although it appears she continued to struggle. (Tr. 249-50.)

Plaintiff returned to Dr. Helton on January 14, 2004 with complaints of pain in her upper back, shoulder and neck, and headache. (Tr. 207.) She was noted to have several diffuse areas of paraspinal tenderness. Id. A trigger point injection was administered, and plaintiff reported immediate improvement. Id. She was advised to follow up in one month. Id.

On January 28, 2004, plaintiff saw Mr. Darvell and reported less and anxiety and symptoms of depression, and felt that she was "now able to get a handle on stuff". (Tr. 252.)

Plaintiff returned to Dr. Helton on February 14, 2004 with complaints of chronic back pain, fibromyalgia, depression, and other concerns. (Tr. 208.) She denied new problems or changes since her last visit. Id. Plaintiff became tearful when asked to describe her pain. Id. Dr. Helton assessed fibromyalgia, and prescribed Roxicet,[22] Flexeril,[23] and Anaprox. Id.

---

[22]Roxicet, or Acetaminophen is used to relieve mild to moderate pain from headaches, muscle aches, menstrual periods, colds, sore throats, toothaches, backaches, reactions to vaccinations (shots), and to reduce fever. Acetaminophen may also be used to relieve the pain of osteoarthritis (arthritis caused by the breakdown of the lining of the joints). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html

[23]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.

Plaintiff returned to Dr. Helton on March 15, 2004 for reevaluation of fibromyalgia and treatment. (Tr. 209.) She denied new problems, but reported that she had been seeing a chiropractor for back symptoms, and that treatment was helping. Id. She reported that she no longer needed pain control regularly. Id. Dr. Helton's assessment was fibromyalgia, depression, obsessive compulsive disorder, and irritable bowel disorder. Id. He instructed plaintiff to continue her current medications, and return to his office as needed. (Tr. 209.)

Plaintiff returned to Dr. Helton on April 2, 2004 with complaints of hand, knee and back pain. (Tr. 210.) She had some tenderness in her knees bilaterally. Id. She was advised to continue pain control, and take Roxicet as needed. Id.

On April 7, 2004, plaintiff saw Mr. Darvell and apparently reported sleeping all day. (Tr. 253.)

On May 10, 2004, plaintiff saw Dr. Helton with complaints of hand, knee and back pain, and pain in her abdomen. (Tr. 211.) It is indicated that her pain was well controlled on her current regimen. Id. She was advised to continue pain control, and return to the office in one month. Id.

On June 2, 2004, plaintiff saw Mr. Darvell, and it was noted that her mood was low, and she had decided to withdraw from school. (Tr. 255.)

---

http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

On June 18, 2004, plaintiff returned to Dr. Helton and it was noted that the diffuse pain of fibromyalgia was fairly well controlled on her current regimen. (Tr. 212.) She did have some complaints of swelling in her hands and feet when she walked. Id. She was advised to take Roxicet and Hydrochlorothiazide[24] and return as needed. Id. Plaintiff returned on July 16, 2004, and was advised to continue pain control. (Tr. 213.)

On August 12, 2004, plaintiff saw Mr. Darvell and reported she had decided to stop school until Spring of 2005. (Tr. 256.)

Records from Chapel Chiropractic Orthopedics, P.C., the office of Rachel Bartlett, D.C., indicate that plaintiff was seen on April 19, 2005 with complaints of fibromyalgia, back and neck pain, and irritable bowel syndrome. (Tr. 269.) She indicated that her symptoms had worsened, and attributed this to the lack of chiropractic treatment. Id. She reported that she was taking Roxicet, Feldene,[25] Valium, and Lexapro.[26] She reported constant

---

[24]Hydrochlorothiazide (sometimes called a "water pill") is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html

[25]Feldene, or Piroxicam, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684045.html

[26]Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html

pain, fatigue, irritability, anxiety and depression, swelling in her hands, and knee pain. (Tr. 271.) On June 8, 2005, plaintiff returned to Dr. Bartlett and stated that she was sleeping better, and had been eating better. (Tr. 275.) Plaintiff continued to see Dr. Bartlett through June 27, 2005, and the record indicates she was treated with chiropractic manipulation, acupuncture, electric stimulation and heat. (Tr. 267, 279.)

On September 1, 2005, plaintiff saw Mr. Darvell and reported that she was "looking for new employment", and that she continued to struggle with depression symptoms and isolation. (Tr. 261.) On September 21, 2005, it appears that plaintiff continued to feel depressed. (Tr. 262.)

On September 30, 2005, plaintiff saw Dr. Helton for a medication refill, and Dr. Helton wrote, "[n]o new complaints, doing well on current regime." (Tr. 305.) He advised plaintiff to continue taking Roxicet, and return to the office as needed. Id. Plaintiff returned on October 28, 2005 for another medication refill, and Dr. Helton wrote "[n]o new problems or concern [sic]." (Tr. 306.) Plaintiff was given Lexapro and Roxicet, and advised to return to the office as needed. Id.

On November 9, 2005, plaintiff saw Mr. Darvell and it was noted that she was tearful and depressed. (Tr. 265.)[27]

---

[27]The undersigned notes that, from April 30, 2003 to July 20, 2005, plaintiff saw Mr. Darvell on a monthly basis. See (Tr. 240-59.) From August 18, 2005 through September 28, 2005, plaintiff saw Mr. Darvell four times. (Tr. 260-63.) Plaintiff's final two visits to Mr. Darvell were on October 12,

On December 2, 2005, Dr. Bartlett wrote that plaintiff reported an 85% improvement after eight visits, and discontinued care for financial reasons. (Tr. 267.)

On December 23, 2005, plaintiff saw Dr. Helton, and it was indicated she was there to "reevaluate ongoing health concerns and refill meds." (Tr. 308.) Dr. Helton wrote, "[n]o new problems or concerns, except that she feels more irritable." Id. Plaintiff was advised to continue pain control, and her prescriptions for Roxicet and Topamax were refilled. Id.

Plaintiff returned to Dr. Helton on January 20, 2006. (Tr. 309.) No subjective complaints are noted, but it is indicated that Topamax would be combined in a complementary fashion with her other medications to aid sleep. Id.

On February 3, 2006, Joan Singer, Ph.D., completed a Psychiatric Review Technique form, indicating that the assessment period was from August 2, 2001 to September 30, 2001. (Tr. 122-35.) Dr. Singer indicated that plaintiff had the medically determinable impairment of recurrent major depression, anxiety, and personality disorder, not otherwise specified, with dependent and borderline features. (Tr. 125, 127.) Dr. Singer indicated that she had insufficient evidence to determine the degree to which plaintiff was limited, and whether her impairments were disabling. (Tr. 132, 134.)

---

2005 and November 9, 2005, almost one month apart. (Tr. 264-65.)

On this same date, Dr. Singer completed a second Psychiatric Review Technique form assessing plaintiff's current level of functioning. (Tr. 280-94.) Dr. Singer found that plaintiff had the following medically determinable impairments that did not precisely satisfy the diagnostic criteria specified: recurrent major depression, anxiety, and personality disorder not otherwise specified with dependent and borderline features. (Tr. 283-87.) Dr. Singer found that plaintiff had mild restrictions in her activities of daily living and in maintaining social functioning, but no limitations in the areas of maintaining concentration, persistence or pace, or episodes of decompensation. (Tr. 290.)

Dr. Singer discussed findings noted in plaintiff's medical records dated from 2001 to 2005; plaintiff's own statements regarding her activities of daily living; and the noted observations of the defendant agency employee who interviewed plaintiff regarding her applications. (Tr. 292.) Dr. Singer wrote that plaintiff indicated many daily activities, and that the agency interviewer had observed plaintiff to have no problems during the interview. Id. Dr. Singer also noted the interviewer's observation that plaintiff brought her infant niece to the interview; held and rocked her throughout the interview; and changed her diaper. Id. Dr. Singer noted that plaintiff's medical records did not support a finding of a memory impairment or episodes of memory loss, and noted that plaintiff's ability to take

care of her daughter and her infant niece suggested that plaintiff was more capable than she alleged.  Id.  Dr. Singer found that plaintiff's medical evidence did not support the severity of plaintiff's alleged symptoms, and considered plaintiff's statements partially credible. Dr. Singer concluded that, due to plaintiff's current functioning, her impairments were considered non-severe. (Tr. 292.)

Also on February 3, 2006, a Case Analysis form was completed by A. Blattel, a Disability Examiner, who reviewed plaintiff's medical records and evidence concerning her actual level of functioning.  (Tr. 294.)  It was determined that plaintiff's medical records did not support the level of severity plaintiff alleged; that her impairments were non-severe; and that her allegations were considered partially credible.  Id.

On February 21, 2006, plaintiff returned to Dr. Helton and reported she was doing much better on Topamax.  (Tr. 310.) Plaintiff saw Dr. Helton on March 21, 2006 and reported that she was doing well on her current medications, although she had experienced chest pain for five days during the preceding week that resolved.  (Tr. 311.)  Plaintiff returned on April 18, 2006 and complained of headaches, vomiting, nasal congestion, and sinus pressure.  (Tr. 312.)  A strep culture was negative.  Id.

On May 16, 2006, plaintiff saw Dr. Helton and stated that she was doing better.  (Tr. 313.)  She reported that she had received a scholarship at a YMCA, and had visited that day.  Id.

Dr. Helton recommended that plaintiff do water exercise and aerobics at least three, preferably five, times per week. Id. She returned on June 13, 2006 and reported that she was doing well, but had not been utilizing her membership at the YMCA as planned. (Tr. 314.) Dr. Helton counseled her that she must exercise at least three times per week and provide proof thereof, or her pain control would be discontinued. Id.

On July 11, 2006, plaintiff saw Dr. Helton and reported that she had been exercising regularly at the YMCA, and that her mood and energy had improved. (Tr. 315.) Her pain medications were continued. Id. On August 8, 2006, plaintiff saw Dr. Helton and reported doing well. (Tr. 316.) Plaintiff returned on September 6, 2006, and Dr. Helton wrote, "Randi does not voice any new problems or concerns when asked. Reports she has been feeling some better. [sic]" (Tr. 317.)

The record includes a September 14, 2006 letter from the Division of Vocational Rehabilitation, indicating that plaintiff was denied services. (Tr. 297.) Included is a report from Dr. Helton dated September 6, 2006, indicating that plaintiff was unable to do strenuous activity due to pain of fibromyalgia and chronic fatigue, and was "psychologically unstable to maintain gainful employment." (Tr. 296.)

On October 4, 2006, plaintiff saw Dr. Helton for a medication refill, and no complaints were noted. (Tr. 318.) On November 1, 2006, Dr. Helton wrote, "Randi reports she is doing

reasonably well on current medications. She voices no new complaints or concern. [sic]" (Tr. 319.)

On November 23, 2006, plaintiff saw Dr. Helton for a medication refill request, and no subjective complaints are noted. (Tr. 307.) She was given Topamax and Wellbutrin, and her Roxicet was continued. Id.

On November 28, 2006, plaintiff saw Dr. Helton and reported "doing well on current medication." (Tr. 320.) On December 27, 2006, Dr. Helton wrote, "Randi reports she is doing well on current regime. No new complaints or concerns." (Tr. 321.)

Also on November 28, 2006, Dr. Helton completed a Physical Residual Functional Capacity Questionnaire. (Tr. 299-303.) Dr. Helton opined that plaintiff had chronic, diffuse muscle and joint pain, and that she had a history of tender points consistent with a diagnosis of fibromyalgia. (Tr. 299.) Dr. Helton wrote that plaintiff's pain medications controlled her pain to a tolerable level, but did contribute to lethargy. Id. Dr. Helton opined that plaintiff had depression and obsessive compulsive disorder. (Tr. 300.) He wrote that plaintiff was capable of low stress jobs, as long as her employer was tolerant of her condition. Id. He opined that plaintiff could sit and stand for 20 minutes; could stand/walk for about four hours; needed to spend periods of time walking; needed to shift positions from sitting, standing or walking; and could rarely lift less than ten

pounds.  (Tr. 301.)  He opined that plaintiff could rarely twist, stoop, crouch, climb ladders, but could occasionally climb stairs. (Tr. 302.)

On March 17, 2007, Mr. Darvell completed a Mental Residual Functional Capacity Questionnaire.[28]  (Tr. 383-87.) Therein, Mr. Darvell indicated that plaintiff had a current GAF of 52, and that her highest GAF during the preceding year was 60. (Tr. 383.)  Mr. Darvell indicated that plaintiff had a hard time interacting with day to day obligations, and indicated that plaintiff was unable to meet competitive standards, or that she had no useful ability to function, in a vast range of categories.  (Tr. 385.)  Mr. Darvell wrote that he felt that plaintiff would "not only be a liability to herself in a work setting but also for any employer."  (Tr. 387.)

Finally, on January 26, 2007, plaintiff saw Dr. Helton and reported that an annual well-woman exam had been performed earlier that month and was normal.  (Tr. 322.)  Her medications were continued.  Id.

**III.    Evidence Before the Appeals Council**

As indicated above, several pages of pharmacy records and a letter from plaintiff's attorney were submitted to the Appeals Council.  (Tr. 325-54.)  The undersigned notes, as did plaintiff's counsel in her letter to the Appeals Council, that the pharmacy

---

[28]The record indicates that this report was provided to the ALJ the day preceding the hearing.  (Tr. 381.)

records confirm that plaintiff was prescribed medication for pain, depression and anxiety from August 23, 2001 through January 15, 2007. See Id.

## IV.     The ALJ's Decision

The ALJ in this case found that plaintiff had not engaged in substantial gainful activity since February 1, 2001, the alleged date of onset. (Tr. 14.) The ALJ found that plaintiff had the severe impairments of fibromyalgia, chronic fatigue syndrome, depression and anxiety, but that her sleep difficulties and herpes were not severe impairments. Id. The ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 15.)

The ALJ determined that plaintiff had the RFC to: understand, remember and carry out at least simple instructions and non-detailed tasks; to respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; to adapt to simple/routine work changes; to take appropriate precautions to avoid work hazards; to lift and carry ten pounds frequently and 20 pounds occasionally; to occasionally climb stairs and ramps but never ropes, ladders or scaffolding; and that she must alternate between sitting and standing. Id. In making this determination, the ALJ noted that he had considered all symptoms to the extent to which they could be considered consistent with the objective medical evidence, and stated that he had considered plaintiff's credibility in accordance with Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and

listed the factors therefrom, and also cited the Regulations and Social Security Rulings that correspond with Polaski and credibility determination. (Tr. 15-16.) The ALJ then thoroughly reviewed and discussed the evidence of record and determined that plaintiff's allegations of symptoms precluding all work were not credible. (Tr. 16-20.)

The ALJ found that plaintiff could not perform any of her past relevant work, but that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (Tr. 21.) In so determining, the ALJ noted that he had obtained VE testimony to determine the extent to which plaintiff's exertional and non-exertional impairments eroded the unskilled light occupational base. Id. The ALJ noted that the VE had testified that jobs existed which a person with plaintiff's abilities and limitations could perform, such as office helper, and assembler. Id. The ALJ concluded that plaintiff had been capable of making a successful adjustment to other work that existed in significant numbers in the national economy, and that a finding of "not disabled" was therefore appropriate. (Tr. 22.) The ALJ determined that plaintiff had not been under a disability as defined in the Act from February 1, 2001 through the date of the decision. Id.

V.      Discussion

To be eligible for supplemental security income under the Social Security Act, a plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker

v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  See 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A) (defining "disability" for DIB and SSI purposes).  The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  Id.  It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42.  The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied.  Next, the Commissioner decides

whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217; <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence,

the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585–86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff challenges only the ALJ's findings regarding plaintiff's allegation of a mental impairment,

and makes no mention of the ALJ's findings concerning any of her other alleged impairments, including fibromyalgia.

Plaintiff argues that substantial evidence does not support the ALJ's decision regarding plaintiff's alleged mental impairment because he failed to ensure a fully and fairly developed record, inasmuch as he failed to recontact Mr. Darvell despite having found his notes to be "virtually indecipherable." Plaintiff also suggests that Mr. Darvell's findings support the conclusion that she meets Listing 12.04B and 12.06B.

Plaintiff also argues that the ALJ failed to consider evidence from various sources in the record documenting that she was observed to be tearful and to exhibit depressive symptoms, and the evidence from Dr. Stromsdorfer describing the circumstances under which he discontinued her care. Finally, plaintiff argues that the ALJ mischaracterized evidence, inasmuch as he noted, to plaintiff's detriment, her non-compliance with treatment and her abusive behavior towards Dr. Stromsdorfer's staff without recognizing that her disabling mental condition caused such behavior. In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence. For the following reasons, the Commissioner's arguments are well-taken.

A.    Fully and Fairly Developed Record

Plaintiff first contends that the ALJ failed to fully and fairly develop the record, inasmuch as he failed to re-contact Mr. Darvell despite having observed his treatment notes to be

"virtually indecipherable." Plaintiff also suggests that Mr.
Darvell's opinion supports the conclusion that she meets Listing
12.04B or 12.06B. The undersigned disagrees.

Although an ALJ has an independent duty to develop the
record in a social security disability hearing, an ALJ is not
required to seek additional clarifying statements from a treating
physician unless a crucial issue is undeveloped. Goff v. Barnhart,
421 F.3d 785, 791 (8th Cir. 2005)(citing Stormo v. Barnhart, 377
F.3d 801, 806 (8th Cir. 2004)). While the Regulations provide that
the ALJ should re-contact a treating physician in some
circumstances, "that requirement is not universal." Hacker v.
Barnhart, 459 F.3d 934, 938 (8th Cir. 2006). Instead, the
Regulations provide that the ALJ should re-contact medical sources
"[w]hen the evidence [received] from [the claimant's] treating
physician or psychologist or other medical source is inadequate"
for the ALJ to determine whether the claimant is disabled. 20
C.F.R. §§ 404.1512(e), 416.912(e). When the ALJ is able to
determine from the record whether the applicant is disabled, the
treating physician need not be re-contacted. Hacker, 459 F.3d at
938 (citing Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

As the Commissioner correctly notes, the law plaintiff
cites in support of her argument that the ALJ should have re-
contacted Mr. Darvell is applicable to medical opinions. Because
Mr. Darvell is a social worker, his opinion does not fall into the
category of a medical opinion. In his decision, the ALJ correctly

noted that, while social workers are not acceptable sources of medical evidence for establishing a medically determinable impairment, their reports can be considered in determining the severity of an alleged impairment and any resulting limitation on the ability to function. Review of the ALJ's decision reveals that, even if Mr. Darvell's opinion could be considered a "medical opinion", the ALJ was under no obligation to re-contact him. Substantial evidence supports the ALJ's decision to discount Mr. Darvell's opinion.

In this case, the ALJ received Mr. Darvell's treatment notes and his Mental Residual Functional Capacity Questionnaire the day preceding the hearing. The ALJ then noted that he had reviewed Mr. Darvell's opinion which imposed "dire functional conclusions," and wrote that the basis for such conclusions was unclear because Mr. Darvell's treatment notes were "virtually indecipherable." (Tr. 20.) However, the illegibility of Mr. Darvell's notes was only one factor the ALJ cited in his decision to give Mr. Darvell's opinion little weight.

The ALJ wrote that the majority of the evidence of record was inconsistent with Mr. Darvell's conclusions in his medical source statement. "An appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion." Goff, 421 F.3d at 790-91; Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) ("the ALJ need not give controlling weight to a physician's RFC assessment that is inconsistent with other

substantial evidence in the record.") In so finding, the ALJ noted that plaintiff had not been hospitalized due to her mental impairments since her alleged onset of disability. In addition, the undersigned notes that, while Dr. Stromsdorfer indeed noted that plaintiff's condition may cause her to act out in the manner observed when treatment was discontinued, he did not opine that plaintiff was in such a state that she required hospitalization. This militates against a finding that plaintiff is totally disabled from all work due to a mental impairment. Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999) (finding claimant was not disabled because, among other reasons, she had never been hospitalized for mental impairment.)

The ALJ also noted that, while plaintiff saw Dr. Stromsdorfer for a short period in 2001 and 2002, he discharged her from treatment, and plaintiff neither sought nor received additional psychiatric treatment during the time of her alleged disability. See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (A lack of regular and sustained treatment is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (the absence of ongoing failure to seek treatment may be considered as inconsistent with a finding of disability); see also Banks v. Massanari, 258 F.3d 820, 825-26 (8th Cir. 2001) (ALJ properly discounted claimant's complaints of disabling depression because, among other reasons,

she did not seek additional psychiatric treatment).

The ALJ further noted that plaintiff was able to live with and raise her daughter without having a job, which demonstrated a degree of adaptability, ingenuity and resourcefulness inconsistent with a debilitating mental illness. Furthermore, the undersigned notes that plaintiff's treatment providers repeatedly noted that she was well-dressed and groomed. Where a claimant's mental or emotional problems do not result in a marked restriction of daily activities, constriction of interests, deterioration of personal habits, or an impaired ability to relate, they are not disabling. See Gavin v. Heckler, 811 F.2d 1195, 1198 (8th Cir. 1987); see also Banks, 258 F.3d at 825-26 (ALJ properly discounted claimant's complaints of disabling depression as inconsistent with daily activities.)

In addition, the undersigned notes that Dr. Stromsdorfer repeatedly assessed plaintiff as having a GAF of 60. Such an assessment is inconsistent with a disabling mental impairment. Goff, 421 F.3d at 791, 793 (the claimant's GAFs of 58 and 60 contradicted her assertion of a severe mental impairment.)

The ALJ also wrote that Mr. Darvell's findings were based upon what plaintiff told him, and that he had discredited plaintiff's allegations of a disabling mental impairment. Indeed, the undersigned notes that the ALJ properly discredited plaintiff's

subjective complaints after undertaking the proper analysis.[29]

As noted above, in making his credibility determination, the ALJ cited <u>Polaski</u>, 739 F.2d 1320; properly identified the factors therefrom; and considered evidence relevant to those factors. The ALJ reviewed the evidence of record and concluded that plaintiff's subjective complaints of pain were inconsistent with the medically objective evidence and with other evidence of plaintiff's ability to engage in everyday activities.

The ALJ noted that, despite plaintiff's allegations of severe debilitating symptoms, she was rarely observed to be in acute distress. The ALJ also noted that, when plaintiff applied for benefits, it was observed that she had no difficulty sitting, standing, walking, using her hands, understanding, talking and answering. The ALJ noted that it was also observed that plaintiff brought her infant niece to the interview, and that she changed a diaper and held and rocked the baby throughout the interview. Following the interview, plaintiff carried, without difficulty, a car seat, two diaper bags, and her purse to her car. Finally, the ALJ noted that plaintiff displayed a normal appearance and demeanor during the hearing. It is "completely proper" for an ALJ to consider the claimant's demeanor during the hearing in making credibility determinations. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1375

---

[29]Although plaintiff does not challenge the ALJ's credibility determination, the undersigned will briefly review it here because it relates to the ALJ's decision to assign little weight to Mr. Darvell's opinion.

(8th Cir. 1993)).

The ALJ noted that Dr. Sanders reported on January 31, 2001 (the day immediately preceding plaintiff's alleged onset date) that plaintiff had undergone a long evaluation with Dr. P. Moser, a rheumatologist, and that all evaluations were normal. The ALJ further noted that Dr. Sanders' evaluation was normal. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990)(ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time).

The ALJ further noted that, although plaintiff testified that Drs. Sanders and Moser diagnosed her with fibromyalgia, neither physician did so, and that this discrepancy reflected disfavorably on plaintiff's credibility. It is proper for an ALJ to consider the fact that the claimant's testimony is inconsistent with other evidence in the record. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

The ALJ further noted that plaintiff was not compliant with the exercise regimen prescribed by Dr. Sanders, and that, while in psychiatric treatment with Dr. Stromsdorfer, plaintiff

missed numerous appointments and was abusive towards the staff, and was ultimately discharged from care due to this behavior. The ALJ also noted that plaintiff left an Emergency Room on April 23, 2001 against medical advice, and on July 23, 2001 declined offered referrals. The ALJ opined that, if plaintiff were truly distressed by her alleged mental symptoms, she would have been motivated to cooperate with treatment. Failure to follow a prescribed course of remedial treatment without good reason is inconsistent with complaints of a disabling condition. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)(citing Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)); see also Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).

The ALJ further noted that, when discharged from Dr. Stromsdorfer's care, it was noted that plaintiff wanted disability. Indeed, the undersigned notes that, based upon plaintiff's hearing testimony on this subject, and based upon the notations in Dr. Stromsdorfer's records, it appears that plaintiff's abusive behavior towards the staff stemmed from plaintiff's repeated insistence that she wanted a report from Dr. Stromsdorfer, and the staff's repeated replies that the report she sought would not be provided. While not dispositive, such evidence is one factor detracting from plaintiff's credibility. As the ALJ noted, subjective complaints may be discounted if the claimant appears to be motivated for seeing disability benefits. Gaddis v. Chater, 76 F.3d 893, 895-96 (8th Cir. 1996).

The ALJ also noted that Dr. Stromsdorfer opined aloud to

plaintiff that her condition was improving despite her assertions to the contrary, and that plaintiff did not disagree. The ALJ considered this evidence as support for the conclusion that plaintiff tended to exaggerate her symptoms, and that her condition is better than she alleges. An ALJ may discount a claimant's allegations if there is evidence that she is a malinger or was exaggerating symptoms for financial gain. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

The ALJ also noted that Dr. Stromsdorfer repeatedly assessed a GAF of 60, a score at the "absolute top" of the moderate range, and one point removed from the mild range, inconsistent with allegations of disability on the basis of mental impairment. (Tr. 17.) The Eighth Circuit has stated that GAF scores of 58 and 60 support a finding of an ability to perform simple, routine, repetitive work; were inconsistent with a doctor's opinion that a claimant suffered from extreme limitations; and contradicted assertions of a severe mental impairment . Goff, 421 F.3d at 791, 793.

The ALJ also noted that Dr. Helton's records repeatedly documented that she was doing well on her current medication regimen. The undersigned also notes that Dr. Helton's records dated September 30, 2005 through January 26, 2007 are devoid of subjective complaints by plaintiff, and full of references that her medications were controlling her symptoms. Impairments which can be controlled by medication are not considered disabling. Brown, 390 F.3d at 540; see also Goff, 421 F.3d at 793 (medical evidence

indicating that the claimant's depression was stable on medication supported the ALJ's determination that she retained the RFC to perform simple, routine work.)

Finally, the ALJ noted that plaintiff did not have the type of work record that enhanced her credibility. The ALJ noted that plaintiff had three years with good earnings, but had no posted earnings for the year 2000, which predated her alleged onset date. A poor work history detracts from a claimant's credibility. Ramirez v. Barnhart, 292 F.3d 576, 582 (8th Cir. 2002) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (ALJ properly considered plaintiff's poor work history and the absence of objective medical evidence to support subjective complaints)); see also Pearsall, 274 F.3d at 1218 (citing Woolf, 3 F.3d at 1214).

While certainly not dispositive, the undersigned notes that, while receiving treatment from Drs. Mormol and Helton, and while receiving some emergency room treatment, plaintiff did not complain of psychological symptoms. Allegations of disabling symptoms can be discredited when no such complaints are made while receiving other treatment. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam).

The ALJ in this case properly discredited plaintiff's allegations of a disabling mental impairment after undertaking the proper analysis. The undersigned therefore determines that the ALJ properly considered the fact that Mr. Darvell's opinion was based upon plaintiff's discredited subjective complaints in his decision to discount that opinion. See Craig v. Apfel, 212 F.3d 433, 436

(8th Cir. 2000) (An ALJ may properly discount an opinion which is based upon discredited subjective complaints). Despite plaintiff's argument to the contrary, the record does not support the conclusion that she meets Listing 12.04B or 12.06B of the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1.

Furthermore, based upon a review of the ALJ's decision, it is obvious that he did not feel unable to decide that plaintiff's alleged mental impairment was not disabling and, as explained above, substantial evidence supports that decision. The ALJ was therefore under no obligation to re-contact Mr. Darvell. See Hacker, 459 F.3d at 938 (citing Sultan, 368 F.3d at 863) (when the ALJ is able to determine from the record whether the applicant is disabled, the treating physician need not be re-contacted.) Furthermore, plaintiff fails to identify a "crucial issue" that remained undeveloped which would have required the ALJ to re-contact Mr. Darvell. An ALJ is not required to seek clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff, 421 F.3d at 791 (citing Stormo, 377 F.3d at 806.)

B. Consideration of the Record as a Whole

Plaintiff argues that the ALJ failed to consider evidence supporting her claim for disability due to a mental impairment, and therefore failed to evaluate the evidence in the record as a whole. In support of her argument, plaintiff points to several statements regarding plaintiff's tearfulness and her depressive symptoms in the medical records that the ALJ failed to mention in his opinion.

According to plaintiff, these statements are from the following sources: the medical records of Drs. Sanders, da Silva, and Stromsdorfer; hospital records from two 2001 visits; a December 26, 2000 x-ray revealing "small joint effusion"; and records from Mr. Darvell dated from 2003 through 2005. (Docket No. 16 at 12-13.) Plaintiff's argument has no merit.

In his decision, the ALJ specifically noted and discussed in detail the medical records of Drs. Sanders and Stromsdorfer; the hospital records; and Mr. Darvell's medical source statement. The undersigned notes that Dr. da Silva's office note is contained within Dr. Stromsdorfer's records. The fact that the ALJ did not reproduce in his opinion the statements plaintiff claims support her claim for mental disability does not defeat the ALJ's decision. Because the ALJ wrote that he had considered the evidence and indeed discussed it in his opinion, the undersigned considers it highly unlikely that the ALJ failed to consider the statements plaintiff cites. See Black, 143 F.3d at 385-386 (holding that ALJ did not err in failing to discuss a letter from a treating source expressing the opinion that the claimant was disabled on the basis that the ALJ was not required to discuss every piece of evidence, the ALJ did reference the doctor's evaluation and relied upon relevant treatment information from the doctor's notes, and that it was unlikely the ALJ had not considered the doctor's opinion regarding disability). Regarding Mr. Darvell's treatment notes, while the ALJ did note that they were illegible, the portions plaintiff claims were ignored are her subjective complaints, which

are the same as those contained in Dr. Stromsdorfer's records, and which the ALJ properly discredited.

Furthermore, as discussed above, the ALJ properly discredited plaintiff's subjective complaints of a disabling mental impairment. This, rather than a failure to consider the evidence, most likely explains the ALJ's failure to reproduce in his opinion the statements plaintiff references. Review of the ALJ's decision reveals that he based his decision upon all of the credible evidence in the record as a whole.

C. <u>Allegedly Mischaracterized Evidence</u>

Plaintiff finally contends that the ALJ mischaracterized evidence from Dr. Stromsdorfer that plaintiff was discharged from treatment due to non-compliance and abusive behavior towards the staff, and the fact that she was uncooperative during hospital visits. In support, plaintiff argues that the ALJ failed to recognize that plaintiff's depression, anxiety and personality disorder could lead to this type of behavior. The undersigned disagrees.

In his decision, the ALJ noted the foregoing behavior and concluded that "[i]t would seem that if the claimant were truly distressed by her alleged mental symptoms that she would have been motivated to cooperate with treatment." (Tr. 17.) The ALJ concluded that the failure to comply with treatment was inconsistent with allegations of a disabling condition, citing <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996).

As the Commissioner correctly notes, Dr. Stromsdorfer's

notes indicate that plaintiff wanted disability; that she was improving despite her subjective allegations to the contrary; and that she had repeated GAF assessments of 60. The ALJ properly considered Dr. Stromsdorfer's findings in their entirety; properly discredited plaintiff's subjective allegations after undertaking the proper analysis; and properly found that plaintiff's level of functioning was inconsistent with total disability due to a mental impairment. Furthermore, the ALJ's RFC assessment includes the psychological limitations he found to be credible and supported by the record. Finally, Dr. Stromsdorfer's records regarding the circumstances under which treatment was discontinued was only one of numerous factors the ALJ considered in his decision. The ALJ did not mischaracterize any evidence, and the undersigned finds no error in the ALJ's failure to note Dr. Stromsdorfer's observations regarding plaintiff's motivations for her behavior.

Therefore, for all of the foregoing reasons, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001; Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of March, 2009.